UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARKEL AMERICAN INSURANCE COMPANY, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER 04-376** |
| **SCHUBERT'S MARINE EAST, INC., ET AL.** | **SECTION "L" (3)** |

## ORDER & REASONS

Before the Court are Essex Insurance Company's ("Essex") Motion for Summary Judgment (Rec. Doc. 65) and Markel American Insurance Company's ("Markel") Cross Motion for Summary Judgment (Rec. Doc. 82). For the following reasons, Essex's motion is DENIED and Markel's motion is GRANTED.

**I.    BACKGROUND**

On November 8, 2002, Atlas Marine Group ("Atlas") delivered a vessel it owned, the forty-six foot Hatteras sport-fishing boat M/V MAD HATTER, to Schubert's shipyard in New Orleans to receive various repairs.[1] The repairs included removing the barrier coat from the vessel's hull, removing any moisture from the hull, and thereafter recoating the hull with a protective marine coating. The vessel was insured by a marine insurance policy issued by Markel which insured against, among other things, physical damage to the vessel.

Schubert's removed the barrier coat and initially attempted to remove moisture from the

---

[1] The Court's use of "Schubert's" throughout this order should be understood to refer to both Schubert's Marine East, Inc. d/b/a Schubert's Marine Sales and Service, Inc. and Crescent City Marine Group, Inc. d/b/a Schubert's Marine.

1

vessel's hull using conventional methods. After several weeks, however, the fiberglass layers of the hull were still retaining moisture. Schubert's subsequently contacted Atlas and advised that there was an alternative method available for drying out the hull, known as the HotVac system. Schubert's allegedly told Atlas, however, that it did not have experience with the HotVac system. Thus, Atlas advised that it did not want the MAD HATTER to be a "guinea pig" for the HotVac system and instructed Schubert's not to use this alternative drying method.

Despite these alleged conversations, Schubert's hired Jamie Cranch d/b/a Reliable Marine ("Cranch") to use the HotVac system on the MAD HATTER. On February 11, 2003, Cranch applied the HotVac system pads to the vessel's hull while the boat was on Schubert's premises. Several days later, Cranch removed the pads and discovered multiple wrinkles to the bottom hull laminates.

Markel paid Atlas its policy limits after determining that the vessel was a constructive total loss (due to the prohibitive cost of repair) and thus became subrogated to the rights of Atlas. On February 10, 2004, Markel and Atlas filed suit in this Court alleging negligence and breach of the warranty of workmanlike performance against Schubert's, Schubert's insurer Scottsdale Insurance Company, and Cranch. Markel alleges that the damage to the MAD HATTER was caused by the improper use of the HotVac system and the overheating of the hull and seeks over $250,000 plus pre-judgment interest.

Markel and Atlas subsequently amended their complaint to include claims against Cranch's insurer Essex.[2] Cranch was insured under a Commercial General Liability ("CGL")

---

[2] Shortly thereafter, Atlas settled all of its claims against the Defendants and was dismissed from the litigation, leaving Markel as the sole Plaintiff. *See* Rec. Doc. 61.

policy issued by Essex, Ocean Marine Liabilities Policy No. 9CA3448, which provided marine general liability, marine protection and indemnity, and marine legal liability coverage to Cranch for the period February 19, 2002 to February 19, 2003.  The policy utilized the common CGL coverage form with specific endorsements for its specialized coverages.  Specifically, the policy states that Essex "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and that the "insurance applies to 'bodily injury' or 'property damage' only if the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'" during the policy period.  (Essex's M. fo Summ. J. Ex. 1.)  The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Essex's M. fo Summ. J. Ex. 1.)

According to the relevant policy exclusions, however, the insurance does not apply to: (1) "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard" (Your Work Exclusion); (2) "Property damage" to "impaired property" or property that has not been physically injured (Impaired Property Exclusion); or (3) "costs or expenses to make good faulty workmanship, material, or design" (Marine Operators Liability Exclusion 6(H)).  (Essex's M. fo Summ. J. Ex. 1.)

## II.  PRESENT MOTIONS

Essex and Markel have filed cross motions for summary judgment on the issue of Cranch's insurance coverage.

Essex argues that the CGL policy it issued to Cranch does not provide coverage in this case, and therefore that it has no duty to defend or indemnify Cranch in this litigation.  First,

3

Essex contends that no "occurrence" took place under its policy and, thus, that coverage was not triggered. Second, Essex argues that even if coverage was initially triggered by an "occurrence," any of the three "work-product" exclusions identified above ultimately exclude coverage in this case.

Markel argues that the CGL policy issued by Essex to Cranch does provide coverage in this case. Markel contends that Cranch's misuse of the HotVac system was an "occurrence" causing "property damage" to the MAD HATTER and that the various coverage exclusions do not apply.

### III.   LAW & ANALYSIS

An insurance policy is an agreement between the parties and is interpreted using ordinary contract principles. *See Reynolds v. Select Props., Ltd.*, 93-1480 (La. 4/11/94); 634 So. 2d 1180, 1183. Therefore, when the words of the policy are clear, unambiguously express the intent of the parties, and lead to no absurd consequences, the contract must be enforced as written. *See Central La. Elec. Co. v. Westinghouse Elec. Corp.*, 579 So. 2d 981, 985 (La. 1991). If, however, the words of the policy are ambiguous, the ambiguous provision is to be construed against the drafter and in favor of the insured. *See La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-911 (La. 1/14/94); 630 So. 2d 759, 763-64. In addition, the insurer has the burden of showing that a loss falls within a policy exclusion. *See La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1252 (La. 1993). Lastly, policy exclusions are to be strictly construed in favor of coverage. *See Garcia v. St. Bernard Parish Sch. Bd.*, 576 So. 2d 975 (La. 1991).

The interpretation of an insurance contract is typically a question of law that can be

properly resolved in a motion for summary judgment. *See Indep. Fire Ins. Co. v. Sunbeam Corp.*, 99-2182 & 99-2257 (La. 2/29/00); 755 So. 2d 226, 230. Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. When considering a motion for summary judgment, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

     A.     **Was Coverage Triggered By An "Occurrence"?**

Although the parties do not dispute the underlying material facts, they do dispute whether an "occurrence" took place as defined by the Essex insurance policy as a matter of law. As noted, the insurance only applies if property damage is caused by an "occurrence." The policy defines "occurrence" to be "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Essex's M. fo Summ. J. Ex. 1.)

As the United States Court of Appeals for the Fifth Circuit has noted:

> Considered in tandem with the business risk exclusion, the "occurrence" requirement illuminates the allocation of risk. Direct (as opposed to consequential) damages that naturally follow from a breach of contract are conclusively presumed to have been in the contemplation of the parties and may therefore constitute expected or intended damages. A comprehensive general liability policy does not cover this cost of doing business. . . . But an occurrence takes place where the resulting injury or damage was unexpected and unintended, regardless of whether the policyholder's acts were intentional. The requisite accident may inhere in the scope

of damages.

*Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 604-05 (5th Cir. 1991) (citations omitted); *see also First Texas Homes, Inc. v. Mid-Continent Cas. Co.*, No. 00-1048, 2001 WL 238112 (N.D. Tex. Mar. 7, 2001).

In Louisiana, the reports are replete with manufacturing and construction defect cases interpreting the term "occurrence" in CGL policies. *See, e.g., Thibodaux v. Arthur Rutenberg Homes, Inc.*, (La. App. 1 Cir. 12/22/05); 928 So. 2d 80; *Broadmoor Anderson v. Nat'l Union Fire Ins. Co. of La.*, No. 40,096, p. 9-15 (La. App. 2 Cir. 9/28/05); 912 So. 2d 400, 405-08; *Gaylord Chem. Corp. v. Propump, Inc.*, 98-2367 (La. App. 1 Cir. 2/18/00); 753 So. 2d 349. In general, the Louisiana courts find that an unforeseen or unexpected loss, from the standpoint of the victim or owner rather than the insured, amounts to an "occurrence" as defined by the CGL language used in this case. While liability policies are not performance bonds, "defective workmanship or the incorporation of defective materials" are considered "accidents" and, thus, "occurrences," when they result in related property damage. *See* William Shelby McKenzie & H. Alston Johnson, III, *Insurance Law and Practice* § 183, in 15 *Louisiana Civil Law Treatise* (2d ed. 1996).

Essex argues that, at most, Cranch performed defective work without subsequent related property damage. The Court is not persuaded; indeed, it is not merely alleged that Cranch failed to dry the hull of the MAD HATTER. The continuous and repeated exposure of the hull to the heat of the HotVac pads caused wrinkles and warping of the hull, which, in turn, rendered the MAD HATTER a constructive total loss. When Atlas surrendered the MAD HATTER to Schubert's, it could not have expected that faulty workmanship on the hull would result in the

total (constructive) loss of the vessel.  Accordingly, the Court finds that an "occurrence" has triggered coverage in this case.

### B. Do Any Of The Policy Exclusions Apply?

Alternatively, Essex argues that coverage is nevertheless excluded under any of three "work-product" exclusions in its insurance policy:  (1) Your Work Exclusion; (2) Impaired Property Exclusion; or (3) Marine Operators Liability Exclusion 6(H).  While Essex is correct that these exclusions operate to exclude from coverage the costs and expenses associated with making good Cranch's faulty workmanship, *see Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 420 (5th Cir. 1982), Essex misconstrues the nature of Cranch's "work" in this case.

Cranch's "work," or "work product," is somewhat difficult to identify because it is intangible.  Indeed, Cranch did not manufacture a readily identifiable product or component, as did the insureds in many of the cases cited by Essex.  *See, e.g., XL Specialty Ins. Co. v. Bollinger Shipyards Lockport LLC*, 76 Fed. App'x 536 (5th Cir. 2003) (affirming a finding of no coverage where the insured manufactured defective lift boats); *Sharon v. Casky*, No. 32,310, p. 17-20 (La. App. 2 Cir. 9/22/99); 745 So. 2d 653, 664-66 (finding that the insured's "work" consisted of the house and lot that it constructed).  Rather, Cranch was hired by Schubert's to perform a service, namely to dry out the hull of the MAD HATTER using the HotVac system.  Cranch's "work," therefore, consisted of the process of drying out the hull the with HotVac system.  While this "work" was allegedly performed improperly, the Plaintiff does not seek recovery for damage to the "work," but instead seeks recovery for the unexpected damage to Atlas's vessel occasioned by the faulty "work."  Therefore, neither the Your Work Exclusion nor the Marine Operators Liability Exclusion 6(H) are applicable here.  Similarly, this case does not involve damage to

"impaired property," because the MAD HATTER cannot be restored by curing Cranch's faulty "work," that is, by properly drying out the hull. Thus, the Impaired Property Exclusion is also inapplicable.

### IV.     CONCLUSION

For the foregoing reasons, the Court finds that coverage under Essex's insurance policy has been triggered by an "occurrence" and is not excluded by any of the identified exclusions. Accordingly, IT IS ORDERED that Essex's Motion for Summary Judgment is DENIED and Markel's Cross Motion for Summary Judgment is GRANTED.

New Orleans, Louisiana, this __4th__ day of __January__, 2007.

_____
UNITED STATES DISTRICT JUDGE